JANVIER, Judge.
This possessory action was brought in the Twenty-fourth Judicial District Court for the Parish of Jefferson on April 7, 1954, by the Whitney National Bank of New Orleans as Trustee of New Orleans Plantation Trust against Albert Munch, Edwin Munch, John P. Munch, Jr., Mrs. Catherine Munch, wife of Dominick Rudolph and Mrs. Tieme Creppel, widow of John P. Munch, now wife of Olaf Besses-sen (or Besson).
We shall refer to Whitney National Bank of New Orleans which is acting as trustee of the owner of the land in question as petitioner or plaintiff. Though Mrs. Tieme- Creppel Munch has remarried, throughout the record she is referred to as Mrs. Munch and we shall therefore so refer to her.
Plaintiff alleges that in its said capacity as trustee it is the owner of and has complete and perfect record title to and possession of the following described real property:
“A certain tract of land, together with all the buildings and improvements thereon, all the rights, ways, privileges, servitudes and advantages thereunto belonging or in anywise appertaining, situated at Barataría, Parish of Jefferson, State of Louisiana, in Section Ten (10), Township Fifteen (15) South, Range Twenty-three (23) East, Southeastern District of Louisiana, West of the Mississippi River, being a portion of Plat 21 of Plan 89 of Selim Magner, late Notary; said tract of land measures, more or less, -five thousand seven hundred and sixty-two (5,762) feet front on Bayou Bara-taría, is bounded on the southwest by property of W. Richard White et al., on the northwest by a portion of the northwest line of Section Ten (10), and on the northeast by property of the Board of Administrators of the Charity Hospital, the four corners of the said tract being indicated by the letters L K S M on 'a certain sketch of survey of the Civil Engineering Division of the Humble Oil and Refining Company dated June 10th, 1952, numbered LAF-1114, a photostatic copy of which said sketch of survey plaintiff annexes hereto as Exhibit ‘A’ and makes part hereof.”
*147 It alleges that, on or about December 26, 1953, the defendants who pretend to be the owners of all or a part of the said property, acting individually and in concert,* have disturbed petitioner in the enjoyment of its owership and possession by entering upon a portion of it, by cutting down trees, by erecting a wire fence partially enclosing a part of the property, and by placing thereon cattle for grazing. Petitioner prays that the defendants be enjoined from entering upon the said land and from doing any of the other things mentioned and from interfering in any way with the possession, occupancy, use and enjoyment of the property by petitioner in its said capacity; and it also prays for judgment against said defendants in the sum of $4,800 as damages and for judgment maintaining and quieting it in its possession of the property.
After a hearing on the rule for injunction, a preliminary injunction was granted. The defendants then answered, not contesting the record title of plaintiff to any part of the entire tract, but asserting actual possession in themselves of the “Southwest portion” of the tract and averring that the said Southwest portion has been in their possession as owners and under fence for 32 years, and that during that time they have grazed cattle thereon. By reconven-tional demand defendants prayed for judgment recognizing them as entitled to possession of that southwest portion. They particularly denied that the plaintiff had been in actual physical possession of the said southwest portion of the property during the year preceding the bringing of this possessory action. Later they especially pleaded the prescription of one year based on the provisions of Article 3456 of our LSA-Civil Code and Article 59 of our Code of Practice, which articles provide that a possessory action must be brought within one year from the occurrence of the disturbance. Defendants particularly contend that during that year plaintiff was not in actual physical possession of the property and especially that it was not in actual physical possession at the time the disturbance occurred which, according to defendants, was in 1923.
After an extended trial there was judgment maintaining the plea of prescription of one year and dismissing the suit of plaintiff. In the reasons for judgment given by the District Judge appears the following:
“The testimony of all of the witnesses produced both by the plaintiff and the defendant convinced the Court that at the time of the filing of the suit, namely, on April 7, 1952, (sic 1954), that the plaintiff herein was not in possession of said property and had not been for at least one year prior to the time of the filing of the suit.
“* * * Thus the Court being convinced of the absence of possession by the plaintiff herein for a period of one year prior to the time of the filing of this suit, must grant relief sought by the defendants through the medium of their plea of prescription of one year prior to the time of the filing of the suit.”
If the plaintiff in a possessory action is to succeed, there are four requisites. They appear in Article 49 of our Code of Practice. (1) There must be “real and actual possession of the property at the instant when the disturbance occurred; a mere civil or legal possession is not sufficient”; (2) the plaintiff must have had actual possession quietly and without interruption for more than a year previous to the disturbance ; (3) there must have been a real disturbance; (4) the possessory action must be brought within a year of the time at which the disturbance took place.
The defense is actually founded on the contention that two of these requisites have not been met. First, it is contended that though plaintiff in its capacity did have legal title to the entire tract, including the southwest portion, it did not have actual corporeal possession during the year which preceded the filing of the suit, and second, *148 it is contended that such disturbance as took place occurred more than one year before the suit was filed.
Defendants concede that the record title to the entire tract is in plaintiff in its said capacity, and they also concede that they have not possessed as owners more than that portion of the tract which is rather indefinitely described'as the southwest portion, and they maintain that such disturbance as may have occurred took place in 1923, many years before the suit was filed.
We first consider the question of whether the disturbance occurred during the year which preceded the filing of the suit. First it should be noted that while there are five defendants, four of them are children of the fifth who is the mother, Mrs. Tieme Creppel Munch; She may properly be called the principal' defendant since it is on her actions' in 1923 and thereafter that all of the defendants rely on the contention that the disturbance took place in 1923 and not in 1953 as is maintained by plaintiff.
Mrs. Tieme- Creppel Munch was title owner of and actually resided on a small tract of land adjoining at one end the southwest corner of the tract of which plaintiff is title owner. There was no fence between the small tract of Mrs. Munch and the end of the property involved in this litigation.
In 1923 Mrs. Munch constructed a fence which extended from the end of the division line between her property and the tract of land in question, this fence extending for an undisclosed distance along the side of the tract of plaintiff, but it did not run to the other end of that tract,After extending an undisclosed distance along one side of the tract, this fence turned across the tract of plaintiff and extended for an undisclosed distance but did not entirely cross the property. Thus a portion of one end, one entire side, and the entire other end of the so-called southwest portion was not enclosed by fence. The fence consisted of strands of barbed wire, nailed from tree to tree or from post to post in places where the trees were too far apart £o support the wires. During the years from' 1923 to 1951 or 52, a few head of'cattle belonging to some of the various defendants were intermittently permitted to graze on that portion of the property which was partially under fence. In 1951 Mrs. Munch decided to move from her own property alongside the tract of plaintiff and she went to reside in Crown Point, a small settlement a few miles away. There is some evidence to the effect that at that time and thereafter a few head of cattle were permitted to graze on that southwest portion of the property.
Between 1946 and 1949 there was oil drilling activity in the area, and the title owners of the entire tract entered into the usual lease contract for exploration of gas and óil, and when it was found that Mrs. Munch lived alongside one end of the property and that that southwest portion was partially fenced, the drilling company found it advisable to make certain that there was no adverse claimant to the property and a representative was 'sent to interview Mrs. Munch and to clear up that question. This representative was placed on the witness stand -and he' produced a document which he said had been executed by Mrs. Munch on August 5, 1946, by the making of her mark. In this document appeared the following:
“There has been no cultivation of any of this land and the only activity on the land has been trapping. Mr. James S. Webb is the agent for the ■New Orleans Plantation Company Incorporated and has leased out the trapping privileges.
“I have fenced about half of the tract belonging to the New Orleans Plantation Company Incorporated but the fence .covers only that portion of land fronting on the road. I have done this to prevent my cattle from straying on to the road, and have written permission from the New Orleans Plan *149 tation 'Company Incorporated to do so. I do not claim ownership of any of this land, and recognize the ownership of the land by the New Orleans Plantation Company Incorporated.”
Mrs. Munch denied that she had executed the statement and said that she knew nothing about it, though she admitted that a representative of the drilling company had called on her, and said that he had called merely for the purpose of obtaining her consent ■to the cutting of the fence in order that the' .drilling equipment, might more easily reach the spot at which the well was to be drilled and which was immediately inside the fence which she had constructed in 1923 and was on that southwest portion which is here involved.
We deem it of transcendent importance that it be determined whether Mrs. Munch actually executed that statement, for if she did, it follows that, although she at that time was to some extent making use of some part of the property, she knew that she was using it by the sufferance of and with -the permission of the owner and did not claim to possess as owner.
There appears on the document as a witness the name of Mrs. D. Rudolph. Mrs. Rudolph is a daughter of Mrs. Munch and is herself one of the defendants. When first confronted with the document, Mrs. Rudolph readily identified her signature as a witness to the mark of her mother. Later, realizing the importance of the statement, she attempted to recant by saying that she thought it was not her signature and she then intimated that it could not have been her signature, saying that she had not been married to Rudolph until after the date of the document. The document, as we have said, bore the date of August 5, 1946. Later, during the trial, Mrs. Rudolph was again on the witness stand and she apparently realized that the date of her marriage to Rudolph either had been or could easily be ascertained, and she then said that she was mistaken as to the date of her marriage and that, as a matter of fact, she was married to Rudolph in 194S, which was the year previous to that in which the said statement is said to- have been made. ' ■
There was also produced a letter which it is contended Mrs. Rudolph wrote for her mother in 1945 and in which her mother had evidenced the fact that she made no claim to the possession of any part of the tract as owner. Plaintiff maintains, that this letter was actually written by Mrs. Rudolph for. her mother, but both the mother, Mrs. Munch, and Mrs. Rudolph deny knowing anything about it. The letter was admitted -in evidence only for the purpose of comparing signatures and handwriting. Mrs. Rudolph was asked to write on a sheet of yellow paper certain words which appear- in the letter and also her signature. She did this, and while we make no pretense to be in any sense handwriting experts, we think it , quite evident that some of the 'chirographical characteristics which appear in the letter-are remarkably similar to those which were written by Mrs.' Rudolph on the yellow paper. We think it most significant that while the signature of Mrs. Rudolph on the statement of August 5, 1946, is clearly and legibly written, the signature which Mrs. Rudolph wrote on the yellow paper •. is an almost unintelligible scrawl. This, we believe, evidences an intention of Mrs. Rudolph to attempt to persuade the courts ' that she had not signed as witness to the statement of her mother.
We feel that Mrs. Munch did sign the statement in which she acknowledged that she was using the southwest portion of the land by permission of the owner, and there is another fact which appears to us as an indication that she knew that she was not in possession of the land as owner' and that is the fact that, by her own admission, when the drilling company asked permission to cut the fence to go upon the land which she had partially fenced, and there to drill for gas and oil on the very land of which she now claims she had actual possession, she did not require that any *150 rights which she might have had be protected by contract. Counsel for defendants attempt to explain this by saying that Mrs. Munch was illiterate and ignorant of any rights which may have existed; that she knew nothing about oil and gas leases. There might be some force in this argument were it not for the fact that only a few years earlier in 1944, when it was decided to explore for oil and gas on the small tract which Mrs. Munch owned, she saw to it that her rights were actually protected by a formal written contract.
The record is voluminous and contains very contradictory testimony, but it convinces us that when Mrs. Munch entered upon the tract in 1923 and built the fence which partially enclosed the southwest portion of that tract, she knew and admitted that she was not in possession of any part of it as owner and that this realization continued from that time until she moved away and went to live in Crown Point in 1951 or 1952, and that during all that time she made no pretense that she possessed the land otherwise than with the permission of the owner. It thus follows that the original construction of the fence and the continued use of the land during that time did not constitute such a disturbance as is provided by Article 3490 of our LSA-Civil Code which reads as follows:
“The circumstance of having been in possession by the permission or through the indulgence of another person, gives neither legal possession nor the right of prescribing.
“Thus, those who possess precariously, that is, by having prayed the master to let them have the possession, do not deprive him thereof, but, possessing by his consent, they possess for him.”
When, in 1953, Albert Munch returned and stated that he intended to repair or rebuild the fence and take possession of the tract by the placing of signs warning others to keep off, his action did constitute a disturbance. Since this disturbance occurred within the year preceding the filing of this suit, plaintiff was within its rights in proceeding by posses-sory action, providing it is made to appear that plaintiff itself was in actual corporeal, as well as legal, possession of the tract described in its deed.
There is no doubt that the plaintiff in a possessory action must show actual corporeal possession at the time of the occurrence of the disturbance, but we think it well settled that it need not be shown that there was actual possession evidenced by some affirmative action at the exact moment at which the disturbance took place. It is not necessary that the legal owner must show that at that exact moment he was actually on the land doing something which would evidence actual corporeal possession.
In Hill v. Richey, 221 La. 402, 59 So.2d 434, 438, the Supreme Court considered just such a question and quoted with approval the following language from its earlier decision in Ellis v. Prevost, 19 La. 251:
“ ‘It is clear, therefore, that if the article 49 of the Code of Practice was to be construed strictly and according to its literal meaning, there would follow the absurdity, that if a person was-to absent himself temporarily, and leave his house unoccupied for a certain lapse of time, he could not on his. return bring a possessory action, against an intruder, who would have-taken possession of it during his absence, and would be obligated to resort to the petitory action; his adversary would always successfully oppose to him the plea in the words of the Code of Practice: that he was not. in the real and actual possession of the house, at the instant when the disturbance occurred. This cannot have been the intention of the law giver; and such an interpretation is too absurd, to be for a moment countenanced at our hands. * * *’”
*151 In the Hill case the Supreme Court recognized the distinction between real actual corporeal possession and “the possession which is purely civil and legal,” and held that the plaintiff in a possessory action must, as our Code of Practice and our 'Civil Code require, have the real actual corporeal possession at the time of the disturbance. But the Court did not stop there but again, approving its earlier decision in Ellis v. Prevost, supra, quoted the following:
“ ** * * “When a person has once acquired possession of a thing, by the corporeal detention of it, the intention which he has of possessing, suffices to preserve the possession in him, . although he may have ceased to have the thing in actual custody, either himself or through others.” La.Code, articles 3405, 3406 and 3407. Thus, if after having abandoned the corporeal possession of my house, or the cultivation of my field, I continue to possess it civilly; the intention which I have of possessing, will preserve the possession in me; unless a third person has usurped or taken such possession from me, during the time required by law, or I have failed to exercise an actual possession for ten years; and if in the mean time, I am disturbed in my possession, I have the right before the expiration of one year, and by virtue of my civil possession, founded on my previous and anterior corporeal and actual possession of the property, to institute a possessory action to recover it.’ ”
The Court also said:
“ * * Now, we understand the expressions, real and actual possession, contained in this law, as used in contra-distinction with the possession which is purely civil and legal, that is to say: with the possession, which is entirely devoid of the quality of having its source in or being derived from a previous actual and corporeal one; such possession is not sufficient; but when it has been preceded by the corporeal enjoyment of the thing, and the possessor has not ceased to exercise such enjoyment for ten years, the actual possession previously acquired is preserved and maintained, and it continues in the same manner and with the same effect, as if the thing had always been actually and corporeally possessed. * * ”
 There can be no misunderstanding of this language. It means that if at some time in the past, I, the legal owner, have had actual corporeal possession, that previous corporeal possession continues in me until someone does something which disturbs that possession. When that occurs I have the right at any time within one year of the disturbance to bring the pos-sessory action. In the case at bar, when the record owner entered into a lease contract for the drilling for oil or gas on the property and, as a result, the drilling company entered upon the land, such action evidenced actual corporeal possession on the part of the legal owner. After that occurrence nothing was done by any of the defendants except to continue the same use of the land which they had had by sufferance and permission of the owner and with a realization, as evidenced by the statement of Mrs. Munch, that there was no idea that it was being possessed by them as owners. The continuance of that kind of possession did not constitute a disturbance in the corporeal possession of the legal owner.
The first and only disturbance occurred in 1953 when, in December, Albert Munch returned and commenced the rebuilding of the fence and did other things indicating his intention to take possession of the land as owner.
Another interesting contention of plaintiff is that the very possession which is claimed by defendants enures to the benefit of plaintiff for the reason that that possession which defendants claim to have had, *152 being1 with the permission of the title owner, constitutes actual possession for that owner, for, as already shown, Article 3490 of our LSA-Civil- Code in part provides that where one possesses “precariously” as with the permission of the owner, he does not deprive the owner of possession but, possessing by his consent, possesses for the owner. ■ 1 , , 1
There is still another fact which may be pointed to as evidencing the actual corporeal possession of plaintiff, that is, that at the time of the disturbance Mr. and Mrs. Natelie Hebert were occupying a residence which they had built on the land with the permission of the owners. They, to some extent, were watching over the land for the owner. It is true that it has been held that to merely keep watch over land is not to exercise actual corporeal possession. But we think that where the owner allows someone to build on the land and the building continues in existence and the one who occupies it does so with the permission of the owner and under an agreement that, in exchange for the use of the building, he who uses it will watch over the.land for the owner, there is evidenced an actual corporeal possession which continues so long as the said person continues to occupy the building and to keep watch over the land.
It is true that defendants claim that Mr. and Mrs. 'Natelie Hebert were really ■ watching the land for them and not for the title owner. However, Hebert says positively that he was watching it for the title owner and there is no doubt that the house in which he and his wife lived was not on . the “Southwest portion” of which defendants claim to have had possession but was on that other portion of the tract which is not in dispute. And we do not understand why a family such as the Munch family is shown to have been, composed of trappers and hunters, should have found it necessary to watch over hunting, trapping and grazing land.
We think it interesting to note that even if the defendants could be found to be correct and we could hold that during the preceding year plaintiff had not been in corporeal possession of the southwest portion, it would be impossible to determine just what portion of the entire tract constitutes that indefinitely described southwest portion of which defendants claim to have been in possession, for nowhere in the record or in the judgment is there a statement as to just what land is contemplated by the said southwest portion. When there is no legal title, a mere possessor cannot claim that possession of a part of a tract is possession of the whole as can an owner who has title under a deed descriptive of the property. In Rhodes v. Collier, 215 La. 754, 41 So.2d 669, 672, the Supreme Court noted the distinction in such situations between an owner by title and one who claims by adverse possession:
“ * * * As we have already stated, plaintiffs have proved beyond any doubt that the title of Mrs.. Rhodes extends to the division line of Sections 27, 28 and 29 and Sections 52, 53 and 46. The testimony of defense witnesses, respecting evidence of the existence of an established land line farther to the sputh and east than the real division line set forth in Mrs. Rhodes’ deed, cannot benefit the defendant as he, a trespasser, is not in a position to assert that plaintiffs’ civil possession, does not extend -to the limits stated in Mrs. Rhodes’ title, which have been proven to be northwest of the fence erected by him. New Orleans Terminal Co. v. Luckner, 147 La. 967, 86 So. 411. Being without color of title, defendant cannot defeat the possession of the record owner who has corporeal possession of a part other than by an adverse possession by inclosures. * * * ”
Our conclusion is that the plaintiff, at the time of the filing of this possessory action, had actual legal title and, for more than *153 a year, had had corporeal possession of the land in question and that that possession was disturbed by defendants within that year and that consequently the possessory action was filed in time.
We find no proof as to the damage sustained and no mention of it was made in oral argument or in brief. Consequently, we assume that the prayer for damages has been abandoned.
It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is annulled, avoided and reversed and that there now be judgment in favor of plaintiff and against defendants, and that defendants be and they are enjoined from in any way interfering with or disturbing the plaintiff, Whitney National Bank of New Orleans, Trustee of New Orleans Plantation Trust, in the ownership and possession of the following described property:
“A certain tract of land, together with all the buildings and improvements thereon, all the rights, ways, privileges, servitudes and advantages thereunto belonging or in anywise appertaining, situated at Barataría, Parish of Jefferson, State of Louisiana, in Section Ten (10), Township Fifteen (15) South, Range Twenty-three (23) East, Southeastern District of Louisiana, West of the Mississippi River, being a portion of Plat 21 of Plan 89 of Selim Magner, late Notary; said tract of land measures, more or less, five thousand seven hundred and sixty-two (5,762) feet front on Bayou Barataría, is bounded on the southwest by property of W. Richard White, et al., on the northwest by a portion of the northwest line of Section Ten (10), and on the northeast by property of the Board of Administrators of the Charity Hospital, the four corners of the said tract being indicated by the letters LKSMona certain sketch of survey of the Civil Engineering Division of the Humble Oil and Refining Company dated June 10th, 1952, numbered LAF-1114, a photostatic copy of which said sketch of survey plaintiff annexes hereto as Exhibit ‘A’ and makes part hereof.”
And it is further ordered, adjudged and decreed that the said plaintiff, Whitney National Bank of New Orleans, Trustee of New Orleans Plantation Trust, be and it is quieted and maintained in the peaceful possession of the said property; all at the cost of defendants.
Reversed.